UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

GW Grundbesitz AG,

               Plaintiff

    v.

Lezlie Gunn,

               Defendant

Case No. 2:21-cv-02074-CDS-NJK

**Order Granting Plaintiff's Motion for Summary Judgment, Granting Motion for Judicial Notice, Affirming Magistrate Judge's Order, Denying Three Motions, and Closing Case**

[ECF Nos. 7, 40, 41, 63, 68, 69]

Plaintiff GW Grundbesitz sues Lezlie Gunn under Nevada's Uniform Fraudulent Transfer Act (UFTA), arguing that she transferred millions of dollars from a pair of company accounts to her own account to avoid satisfying a judgment after a real-estate deal gone sour. Over the last six and a half years, these parties have been involved in this and related litigation in courts across the globe, from Heidelberg, Germany; to Las Vegas, Nevada; over to Pasadena, California; and now back to Las Vegas. Gunn has repeatedly made similar arguments to courts in each place and failed. She tries the same tactic in this fraudulent-transfer case but fares no better. Despite her staggering efforts to avoid paying what she owes, Gunn cannot get around this simple truth: the weight of legal authority is against her.

Both parties bring several motions, including for summary judgment. Gunn defends that GW Grundbesitz brought this action outside the statute of limitations. And while she does not dispute making the transfer, she insists that she did so in good faith. In contrast, GW Grundbesitz contends that it timely brought this action, that Gunn cannot rely on the good-faith defense, and that the evidence supports its theory that Gunn had the requisite intent to defraud when she transferred the funds to her personal account. Because Gunn's statute-of-limitations argument is unavailing and her good-faith defense relies on an improper theory of liability against a nonparty, Gunn is not entitled to summary judgment. Under Nevada law, I

find that there is no genuine dispute of material fact as to whether Gunn made the transfer and did so with intent to defraud. I therefore grant GW Grundbesitz summary judgment on its sole fraudulent-transfer claim and direct the Clerk of Court to close this case.

I. **Background**[1]

    *a.*    *Factual allegations and related litigation*

       This story begins in Germany in November 2016, when GW Grundbesitz sued A. Investments for unjust enrichment after it kept the proceeds related to the sale of the German real estate, called the "Dossenheim properties." I find the Ninth Circuit's succinct summary of the underlying facts useful and begin with it here:

> Hans-Peter Wild agreed to pay [] Gunn roughly $2.8 million for several parcels of land located in Germany and owned by Gunn's limited liability company, A. Investments. Wild's company, HP Wild Holding AG, wired the $2.8 million purchase money to A. Investments, but Gunn refused to authorize the land transfer. Nevertheless, she kept the money to satisfy debts that she said Wild owed her under a settlement agreement. HP Wild Holding assigned its legal rights from the property transaction to GW Grundbesitz AG, which then sued A. Investments and Gunn in her capacity as its trustee . . . for unjust enrichment. A German court ordered A. Investments to return the money, and a[ German] appellate court affirmed.

*GW Grundbesitz*, 2022 WL 3645062, at \*1. The final German judgment was issued on January 25, 2019. ECF No. 69-3 at 2. And in February 2019, Gunn dissolved A. Investments with the Nevada Secretary of State. ECF No. 64-13 at 2; ECF No. 69-5 at 2. In March 2020, GW Grundbesitz sued A. Investments in this court, seeking recognition of the German judgment in Nevada, which another judge in this district granted in July 2021.[2] *GW Grundbesitz*, 2021 WL 3878293. A. Investments appealed that decision to the Ninth Circuit Court of Appeals, which ultimately

---

[1] The majority of the parties' disputes in this case seemingly involve differences of opinion as to the legal issues, not necessarily the facts. But to the extent that additional background is needed, U.S. District Judge Jennifer Dorsey's order granting recognition of the German judgment is rather instructive, and I incorporate it by reference here. *GW Grundbesitz AG v. A. Invs., LLC*, 2021 WL 3878293, at \*1–2 (D. Nev. July 28, 2021), *aff'd*, 2022 WL 3645062 (9th Cir. Aug. 24, 2022).

[2] For ease, I refer to this case as "the recognition action" throughout this order, as it recognized the final German judgment under Nevada law.

affirmed summary judgment—and recognition of the German judgment—in GW Grundbesitz's favor. *GW Grundbesitz AG*, 2022 WL 3645062, at *2.

In the post-judgment phase of the recognition action, on September 3, 2021, GW Grundbesitz alleges that it propounded written discovery on Gunn as A. Investment's trustee. ECF No. 67 at 6. The discovery request asked Gunn to identify all of A. Investments' assets and any transfers of A. Investments' assets made from December 2015 through 2021. *Id.* On November 1, 2021, Gunn served her discovery responses on GW Grundbesitz, which is when GW Grundbesitz alleges that it first learned of Gunn's transfer of all funds from A. Investments' accounts to her own personal account. ECF No. 67 at 4 (citing ECF No. 63; Ex. 1; Ex. 3 at 133:8–134:21). Roughly three weeks later, on November 19, 2021, GW Grundbesitz filed this lawsuit against Gunn for fraudulent transfer under UFTA, which is codified in Nevada as Nevada Revised Statutes (NRS) § 112.180.

*b.*    *Fund transfers*

GW Grundbesitz alleges that Gunn initially disclosed that A. Investments had only one bank account (a checking account), from which Gunn transferred roughly $2.8 million to her personal Merrill Lynch account on July 27, 2016, leaving a balance of $0. ECF No. 64-8 at 2; ECF No. 67-1; ECF No. 68-4. But through discovery in this case, GW Grundbesitz learned that A. Investments had not one, but two, bank accounts—the checking account and a savings account. ECF No. 67 at n.1 (citing ECF No. 67-2). Gunn made a second transfer of $782,610.63 from A. Investments' savings account to her personal account on the same date in 2016. ECF No. 67-2. The total amount of the two transfers is approximately $3.6 million. GW Grundbesitz further alleges that Gunn has two Merrill Lynch accounts, one (Merrill Account 1) that she initially transferred the A. Investments funds to, and another (Merrill Account 2) that she transferred $5 million of the funds from Merrill Account 1 into on September 20, 2021. ECF No. 68 at 6. GW Grundbesitz alleges that Gunn made many more transfers from Merrill Account 1 to Merrill Account 2 after post-judgment written discovery in the recognition action. *Id.* (citing ECF No.

68-8 at 11; ECF No. 68-9 at 11; ECF No. 68-10 at 11; ECF No. 68-12). That post-judgment

discovery revealed that on March 28, 2022, Gunn produced a statement from Merrill Account 1

showing a balance of only $11.34. ECF No. 68-12. The heart of GW Grundbesitz's argument is

that Gunn initially transferred the funds to her personal account to "shield" them from

collection efforts and then transferred them out of Merrill Account 1 to Merrill Account 2 to

further hinder any collection attempt. ECF No. 68 at 6.

*c.*     *Procedural background*

There are five pending motions in this case.[3] GW Grundbesitz sought to subpoena

Gunn's Merrill Lynch bank records, and in response, Gunn filed a motion for a protective order.

ECF No. 31. The magistrate judge denied Gunn's motion, and Gunn appeals that decision. ECF

Nos. 40, 41. Both parties cross-move for summary judgment; GW Grundbesitz seeks judicial

notice of several documents; and earlier in the litigation, Gunn filed a motion to dismiss. ECF

Nos. 7, 63, 68, 69. In its motion for summary judgment, GW Grundbesitz argues that "Gunn

orchestrated the [f]raudulent [t]ransfer with 'actual intent to hinder, delay[,] or defraud' GW

Grundbesitz from recovering the $2.78 million owed by A. Investments." ECF No. 68 at 14. Gunn

insists that this action is time-barred and that she made the transfer in good faith, not with

fraudulent intent. ECF No. 63.

**II.     Discussion**

*a.*     *Gunn's motion to dismiss is denied as moot.*

In January 2022, Gunn filed a motion to dismiss. ECF No. 7. The motion is fully briefed,

as GW Grundbesitz responded and Gunn filed a reply. ECF Nos. 10, 15. In December 2022,

Gunn then filed a motion for summary judgment, and in January 2023, so did GW Grundbesitz.

ECF Nos. 63, 68. Based on the procedural posture of this case—because summary-judgment

motions have been filed—resolution of Gunn's motion to dismiss is unnecessary. Because I

---

[3] All of them are suitable for disposition without oral argument. *See* LR 78-1.

resolve both motions for summary judgment in this order, I deny as moot Gunn's motion to dismiss.

        *b.*        *Gunn's appeal of the magistrate judge's order is denied.*

        1.        Legal standard

Magistrate judges may "hear and determine any pretrial matter pending before the court," with some exceptions, and "[a] judge of the court may reconsider any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). "[R]eview under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed." *Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1014 (9th Cir. 1997). "And '[a]n order is 'contrary to the law' when it 'fails to apply or misapplies relevant statutes, case law, or rules of procedure.'" *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (citation omitted). Under this district's local rules, a party may object to a magistrate judge's ruling on a pretrial matter by filing written objections, and the opposing party may respond. LR IB 3-1(a); Fed. R. Civ. P. 72(a). And "[t]he district judge may affirm, reverse, or modify, in whole or in part, the magistrate judge's order." LR IB 3-1(b).

        2.        Gunn fails to demonstrate how the magistrate judge's order is clearly erroneous or contrary to law.

In August 2022, GW Grundbesitz subpoenaed Gunn's bank records from Merrill Lynch. ECF No. 28-5. Shortly thereafter, Gunn sought a protective order or to quash the subpoena.[4] ECF No. 31. Magistrate Judge Nancy J. Koppe denied Gunn's motion, finding that the bank records are not subject to any privilege, that the scope of the requested records is not overbroad, and that any privacy concerns can be addressed through a stipulated protective order. ECF No. 40. Gunn appeals Judge Koppe's order, arguing that she "misapprehends and fails to address" Gunn's arguments and that she "erroneously addresses arguments that Gunn did not raise while

---

[4] This was a renewed motion for a protective order, as Gunn's first such motion was denied because it "suffer[ed] from several defects." ECF Nos. 25, 30.

failing to address the precise ones she made." ECF No. 41 at 1. GW Grundbesitz responds that Gunn's appeal merely regurgitates the same arguments from her underlying motion for a protective order, that GW Grundbesitz's purpose in seeking the bank records is to show the fraudulent intent required for this claim by Nevada statute, and that Judge Koppe was not required to address every one of Gunn's arguments. ECF No. 44.

I begin by noting that Gunn mistakenly refers to Judge Koppe's order as a "report and recommendation" (R&R). *See generally* ECF No. 41. But because it was an order, it is subject to a lower standard of review than an R&R. *Compare* LR IB 3-1(a) (indicating that the standard of review for magistrate judge orders is "clearly erroneous or contrary to law") *with* LR IB 3-2(b) (noting that for reports and recommendations, a "district judge must conduct a de novo review of those portions of the specified findings or recommendations to which objections have been made"). That is because a discovery dispute, such as whether to permit a subpoena, is not case dispositive and can be decided directly by a magistrate judge. *See Flam v. Flam*, 788 F.3d 1043, 1045–46 (9th Cir. 2015) (quoting *United States v. Reyna-Tapia*, 328 F.3d 1114, 1118 (9th Cir. 2003) (en banc)) (discussing The Federal Magistrates Act, 28 U.S.C. §§ 631–39, which governs magistrate judges' authority, and noting that "[t]he Act 'provides that certain matters (for example, non-dispositive pretrial matters) may be referred to a magistrate judge for decision, while certain other matters (such as case-dispositive motions . . . ) may be referred only for evidentiary hearing, proposed findings, and recommendations.'").

Gunn urges that I "must review the [R&R] *de novo* to determine if it is clearly erroneous[.]" ECF No. 41 at 2 (citation omitted) (emphasis added). But because the underlying motion on which Judge Koppe ruled was non-dispositive, I need only determine whether Gunn has shown that the magistrate judge's order was "clearly erroneous or contrary to law". LR IB 3-1.[5] I conclude that Gunn has not. Gunn raises several arguments in her appeal. She asserts that

---

[5] This is the local rule upon which Gunn primarily relies in making her appeal (ECF No. 41 at 1 (referring to LR IB 3-1)), but she seems to have somehow inadvertently conflated the two different standards throughout her motion.

the magistrate judge analyzed only whether the bank records at issue are privileged, not whether Gunn has a privacy interest in them. ECF No. 41 at 4–5. She also insists that Judge Koppe misunderstood Gunn's argument as to why the subpoena seeks information outside the relevant dates (i.e., banking information other than "the singular 2016 [t]ransfer alleged in the [c]omplaint"). *Id.* at 5. She asserts that Judge Koppe failed to address the balancing test weighing Gunn's privacy interest against GW Grundbesitz's need for the information. *Id.* at 6–7. And finally, she argues that the magistrate judge erred in denying Gunn's offer to hold funds on deposit that could satisfy a judgment in this case. *Id.* at 6–7.

Federal Rule of Civil Procedure 26(c) "confer[s] 'broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required.'" *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)). Judge Koppe properly utilized this broad discretion. ECF No. 40 at 2, 4. She addressed each of Gunn's arguments as to why a subpoena of her bank records should be quashed. *Id.* at 2–5. First, she found that the bank records "are not subject to any privilege." *Id.* at 3. Next, she concluded that the records are relevant because they are potentially related to the fraudulent transfer of money, which is the crux of the sole claim in this case. *Id.* at 4. Lastly, Judge Koppe found that "the subpoena is a proper discovery vehicle for obtaining [the] Merrill Lynch records," concluding that "the Federal Rules of Civil Procedure empower [p]laintiff to choose how it propounds discovery" and that the subpoena does not impose an undue burden because although Gunn objects to it, "Merrill Lynch has not objected to the subpoena on any grounds." *Id.* at 5.

Gunn contends that the bank records contain confidential information such as her "expenditures and purchases, tax payments, stock holdings and trades, and payments of attorney's fees." ECF No. 41 at 5. This, she argues, constitutes "other protected matter" under Rule (d)(3)(A)(iii) and warrants quashing the subpoena. *Id.* at 4–5. She notes that she "did not argue that a privilege applies to her bank records" but that "her privacy interest in the records

falls within Rule 45(d)(3)(A)(iii)'s scope." *Id.* at 4 (citations omitted). But Rule 45(d)(3)(A)(iii) applies only to "privileged or other protected matter," and Gunn fails to demonstrate why her privacy interest constitutes "other protected matter." The burden lies with Gunn to do so, and in controverted cases, "it is up to the court to strike a balance between the degree of relevance of the requested material, the severity of the burden on the subpoenaed person . . . [,] and the utility of the protective mechanisms provided by the Federal Rules." *Neske v. Las Vegas Metro. Police Dep't*, 2022 WL 980603, at *1 (D. Nev. Mar. 31, 2022). Judge Koppe properly considered those factors in determining that GW Grundbesitz's need for discovery outweighed the burden of the request on Gunn.

Contrary to Gunn's assertion, Judge Koppe did not fail to address her privacy interest in the bank records. In fact, Judge Koppe explicitly found that "any privacy concerns can be more appropriately addressed through the entry of a stipulated protective order." ECF No. 40 at 3 (citing *Paws Up Ranch, LLC v. Green*, 2013 WL 6184940, *3–4 (D. Nev. 2013)). In *Paws Up Ranch, LLC v. Green*, Judge Koppe recognized that a party "ha[d] a privacy interest in [] banking documents," a "concern [that] can be addressed through entry of a stipulated protective order" "that limits the use of the documents and the people with access to them." *Paws Up Ranch*, 2013 WL 6184940, at *3–4; *see also Ocean Garden Prods. Inc. v. Blessings Inc.*, 2020 WL 4933646, at *3 (D. Ariz. Aug. 24, 2020) (finding that the defendants' privacy interests in bank records were adequately addressed by the court's protective order). Much like the defendant in *Paws Up Ranch*, Gunn makes vague assertions that she would be prejudiced if Merrill Lynch complied with the subpoena, but she "fail[s] to make a showing of harm or prejudice sufficient to deny the discovery." *Id.* at 4. This is insufficient to demonstrate that her privacy interest would be affected in such a way that the subpoena requests "other protected matter" and must be quashed.

By GW Grundbesitz's own admission, its intent in seeking Gunn's bank records is not to ameliorate its own concerns about Gunn's possible insolvency in paying any eventual judgment. ECF No. 44 at 4. In fact, GW Grundbesitz reiterates that "[t]he Merrill Lynch records have been

requested to refute Gunn's good faith defense and establish that Gunn had the requisite intent under NRS 112.180(1)(a) when initiating the [i]nitial [t]ransfer." *Id.* (quoting ECF No. 25 at n.3). So Gunn's offer to hold the at-issue funds until the conclusion of this litigation ignores the essence of the request. One element of GW Grundbesitz's fraudulent-transfer claim is whether Gunn made the transfer "[w]ith actual intent to hinder, delay[,] or defraud" GW Grundbesitz. Nev. Rev. Stat. § 112.180(1)(a). That statute lists various factors that courts may use to assess whether actual intent is present. *Id.* at § 112.180(2). Among those is whether "[t]he debtor retained possession or control of the property transferred after the transfer." *Id.* at § 112.180(2)(b). As A. Investments' "sole member and representative," Gunn's bank records are relevant in assessing that and other factors. I therefore find that Gunn's offer to hold the funds proposes an unsuitable solution to the wrong issue. And I agree with Judge Koppe that the subpoena is not temporally overbroad, as the transactions bear upon Gunn's good-faith defense. Gunn fails to demonstrate how Judge Koppe's order is clearly erroneous or contrary to law, so I deny her appeal and affirm the order in its entirety.

       *c.*     *I take judicial notice of the five documents that GW Grundbesitz requests.*

GW Grundbesitz filed a "request for judicial notice in support of [its] motion for summary judgment," which I construe as a motion for judicial notice.[6] ECF No. 69. GW Grundbesitz asks me to take judicial notice of the following five documents: (1) a certified English translation of the final German judgment (ECF No. 69-1), (2) a copy of the order granting summary judgment in GW Grundbesitz's favor in the related case that Judge Dorsey decided last year (ECF No. 69-2), (3) the affidavit of judgment from that case (ECF No. 69-3), (4) the Ninth Circuit's memorandum of decision in which it affirmed Judge Dorsey's ruling (ECF No. 69-4), and (5) the articles of dissolution for A. Investments that were filed with the

---

[6] Under this district's local rules, "[a]ll communications with the court must be styled as a motion, stipulation, or notice[.]" LR IA 7-1(b). GW Grundbesitz filed this as a "request," not as a motion, but I nonetheless decide it as a motion in the interests of justice and efficiency. *See* LR IA 1-4 ("The court may sua sponte . . . or on motion change, dispense with, or waive any of these rules if the interests of justice so require.").

Nevada Secretary of State (ECF No. 69-5). ECF No. 69. Gunn did not file a response to the motion for judicial notice, nor does she address it in her response to the underlying motion for summary judgment.[7]

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Courts may take judicial notice of their own records[] and may also take judicial notice of other court proceedings if they 'directly relate to matters before the court.'" *Nat'l Pub. Radio, Inc. v. U.S. Cent. Command*, 570 F. Supp. 3d 866, 868–69, n.3 (S.D. Cal. 2021) (quoting *Hayes v. Woodford*, 444 F. Supp. 2d 1127, 1136–37 (S.D. Cal. 2006)). Further, "courts can typically take notice of the contents and legal effects of public records[.]" *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1052 n.1 (C.D. Cal. 2016).

I can and do take judicial notice of all five requested documents. Items two through four are public records from courts, and the fifth—A. Investments' articles of dissolution—is a public record from a state agency. They are each appropriate for judicial notice. As far as the first document—the English translation of the German court's judgment—I take judicial notice of that as well because GW Grundbesitz's counsel affirms its authenticity and Gunn does not dispute it. *Tahaya Misr Inv., Inc. v. Helwan Cement S.A.E.*, 2016 WL 4072332, at *1 n.3 (C.D. Cal. July 27, 2016) (collecting cases) ("Courts have found that, where properly authenticated, foreign court documents are properly the subject of judicial notice."). GW Grundbesitz's counsel, Aaron R. Maurice, declared under penalty of perjury that "[t]he exhibits attached in support of the [m]otion are taken from the files for this case and are true and correct copies of the files maintained in [his] office." Maurice Decl., ECF No. 68-13 at ¶ 4. He also attests that "[a] true and

---

[7] Gunn filed her response to the summary-judgment motion approximately 22 days after the motion for judicial notice was filed, so she had the opportunity to respond but opted not to. "The failure of an opposing party to file points and authorities in response to any motion . . . constitutes a consent to the granting of the motion." LR 7-2(d).

correct copy" of the "certified English translation of the [f]inal German [j]udgment entered by the Regional Court of Heidelberg, Germany on March 22, 2019[] . . . is attached[.]" ECF No. 69 at ¶ 1. Based on the information before me, I find that the authenticity of the German judgment is not in dispute and is thus appropriate for judicial notice.

        *d.*     *Cross-motions for summary judgment*

                1.     Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

2.      GW Grundbesitz is entitled to summary judgment on its fraudulent-transfer claim because Gunn presents no genuine issue of material fact precluding it, and none of her defenses shield her from liability.

     i.      *The evidence shows that Gunn's conduct involves all of the applicable badges of fraud and thus constitutes a fraudulent transfer under UFTA.*

GW Grundbesitz's sole claim alleges that Gunn fraudulently transferred funds from A. Investments' bank accounts to her own personal accounts, "leaving A. Investments without a penny to its name." ECF No. 44 at 1–2; Compl., ECF No. 1. Its theory is that Gunn did so "with actual intent to hinder, delay[,] or defraud" GW Grundbesitz, and such a transfer is "voidable [and] fraudulent" under Nevada law. ECF No. 1 at ¶¶ 49, 51. "The Uniform Fraudulent Transfers Act (UFTA), codified as Chapter 112 of the Nevada Revised Statutes, 'is designed to prevent a debtor from defrauding creditors by placing the subject property beyond the creditors' reach.'" *Donell for J.T. Wallenbrock & Assocs.*, 2010 WL 11635980, at *2 (D. Nev. Apr. 6, 2010) (quoting *Herup v. First Bos. Fin., LLC*, 162 P.3d 870, 872 (Nev. 2007)). Under UFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay[,] or defraud any creditor of the debtor[.]" Nev. Rev. Stat. § 112.180(1).

"It is the 'rare case in which the debtor testifies under oath that he or she intended to defraud creditors.'" *In re Neal*, 2008 WL 11445440, at *5 (D. Ariz. Nov. 7, 2008) (quoting *In re Nat'l Audit Def. Network*, 367 B.R. 207, 219 (Bankr. D. Nev. 2007)). As such, courts weigh various factors in determining actual intent, including—but not limited to—the following eleven "badges of fraud": whether (a) the transfer was made to an insider; (b) the debtor kept possession or control of the transferred funds after the transfer; (c) the transfer was disclosed or concealed; (d) the debtor had been sued or threatened with a lawsuit before the transfer was made; (e) "[t]he transfer was of substantially all the debtor's assets"; (f) the debtor absconded; (g) the

debtor removed or concealed assets; (h) the value of consideration received by the debtor was "reasonably equivalent" to the value of the transfer; (i) the debtor was insolvent (or became insolvent) shortly after the transfer; (j) the transfer occurred shortly before or after a substantial debt was incurred; and (k) the debtor transferred "the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." Nev. Rev. Stat. § 112.180(2); *see also Donell*, 2010 WL 11635980, at *3 (citing *In re Nat'l Audit Def. Network*, 367 B.R. at 220). "The UFTA list of 'badges of fraud' provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no 'badges of fraud' are present." *United States v. Boyce*, 38 F. Supp. 3d 1135, 1157 (C.D. Cal. 2014) (quoting *In re SCI Real Estate Invs., LLC*, 2013 WL 1829648, at *4 (C.D. Cal. May 1, 2013)).

GW Grundbesitz scrupulously addresses most of the badges of fraud, citing evidence of each. ECF No. 68 at 8–10. Gunn responds by identifying that once the plaintiff-creditor meets its initial burden in a fraudulent-transfer case, the burden shifts to the defendant-debtor "to demonstrate a triable issue of material fact as to the fraudulent nature of the transfer." ECF No. 71 at 7 (quoting *United States v. Real Prop. Located at 5208 Los Franciscos Way, L.A., Cal.*, 385 F.3d 1187, 1192 (9th Cir. 2004)). She concludes that GW Grundbesitz "has not presented sufficient evidence to shift the burden" but that even if it has, Gunn can still prevail because she had legitimate reasons for transferring the funds from A. Investments' accounts to her personal one. *Id.* at 7–8. She does not directly address GW Grundbesitz's discussion of the badges of fraud but urges that they are "nonexhaustive" and that courts "can 'consider any other relevant factor.'" *Id.* at 9 (quoting *Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 390 (5th Cir. 2017). Gunn also cites a litany of cases from various jurisdictions in which courts ruled for the debtor on fraudulent-transfer claim despite the existence of several badges of fraud and urges that I should do the same here. *Id.* at 9 (citing *In re Hurt*, 542 B.R. 798, 807–08 (Bankr. E.D. Tenn. 2015); *In re Ptacek*, 2019 WL 4049842, at *10–12 (Bankr. N.D. Ohio Aug. 27, 2019); *Long Oil Heat, Inc. v. Spencer*, 375 F.

Supp. 3d 175, 196 (N.D.N.Y. 2019); *Princesse D'Isenbourg et Cie, Ltd. v. Kinder Caviar, Inc.*, 2013 WL 147841, at *6 (E.D. Ky. Jan. 14, 2013); *In re Earle*, 307 B.R. 276, 293 (Bankr. S.D. Ala. 2002)). Notably, none of these cases involved as many badges of fraud as are implicated here, even though the existence of all of the badges of fraud is not dispositive as to intent. *See In re Tarkanian*, 562 B.R. 424, 458 (Bankr. D. Nev. June 30, 2014).

Gunn almost entirely glosses over any analysis of the badges of fraud and jumps straight to her defense that she had other reasons for making the transfers. I interpret this as a concession that the badges of fraud weigh against her, particularly in light of her assertion that "the defendant-debtor can still prevail even if the plaintiff-creditor presents sufficient evidence to shift the burden." ECF No. 71 at 7 (citing *Madison Cap. Co., LLC v. Smith*, 2009 WL 482093, at *5 (W.D. Ky. Feb. 25, 2009)). GW Grundbesitz urges that "[t]en of the eleven 'badges of fraud' demonstrate Gunn's actual fraudulent intent when orchestrating the [f]raudulent [t]ransfer." ECF No. 68 at 8. It notes that the eleventh factor (Nev. Rev. Stat. § 112.180(2)(k)) "is inapplicable because the [f]raudulent [t]ransfer did not involve a transfer to a lienholder—the transfer was made directly to an insider (Gunn)." *Id.* at n.5.

Before delving into the badges of fraud themselves, I begin by highlighting a few key undisputed facts that overshadow all of the applicable factors. Importantly, Gunn does not dispute that she made the transfer. ECF No. 71 at 2 ("On July 27, 2016, Gunn transferred the [p]urchase [p]rice from AI to herself (the [t]ransfer)."). Indeed, the bank records produced in discovery show that $2,856,824.79 was wired from A. Investments' Bank of America checking account on July 27, 2016, to Gunn's Merrill Lynch account. ECF No. 68-4 at 6. And they show that a transfer was made from A. Investments' savings account—for $117,997.45—on July 27, 2016, to Gunn's Merrill Lynch account. ECF No. 68-5 at 3. Further, Gunn does not dispute that GW Grundbesitz obtained the German judgment in its favor in January 2019, that A. Investments filed articles of dissolution in Nevada in February 2019, or that Judge Dorsey recognized the final German judgment in July 2021. ECF No. 71 at 3. Also at the outset, I note

that I occasionally rely on cases from other jurisdictions and from various bankruptcy courts throughout this order.[8]

The first badge of fraud is whether the transfer was made to an insider. Nev. Rev. Stat. § 112.180(2)(a). Under Nevada law, one type of insider is defined as "[a] managing agent of the debtor." Nev. Rev. Stat. § 112.150(7)(e). The record is undisputed that Gunn was trustee for A. Investments. Interrog., ECF No. 68-1 at 7. And Gunn explicitly notes that she does not dispute that she was A. Investments' managing member—indeed its "sole member." ECF No. 71 at 1–3. This establishes the first badge of fraud—that the transfer was made to an insider.

The second factor is whether the debtor retained possession or control of the transferred funds after the transfer. Nev. Rev. Stat. § 112.180(2)(b). GW Grundbesitz notes that "[b]ecause A. Investments' funds were transferred to Gunn's personal accounts, Gunn retained full control over A. Investments' assets after the funds were fraudulently transferred." ECF No. 68 at 9. This appears to be undisputed as well. Gunn agrees that the transfers were made to her personal accounts, and she concedes that she was A. Investments' sole managing member. ECF No. 71 at 1–3. So although the funds were no longer in A. Investments' account, they were effectively under A. Investments' control as they were held in its sole managing member's account. This factor tips in GW Grundbesitz's favor.

The third badge of fraud is whether the transfer was disclosed or concealed. Nev. Rev. Stat. § 112.180(2)(c). And the seventh factor is whether A. Investments removed or concealed assets. Nev. Rev. Stat. § 112.180(2)(g). I address these together. GW Grundbesitz contends that "Gunn's audacious efforts to conceal the [f]raudulent transfer from GWG further illustrate her

---

[8] The Nevada Supreme Court recognizes that it was the Nevada "Legislature's intent that [courts] interpret the UFTA in Nevada to conform to other states' interpretations of their respective versions of the UFTA[.]" *Herup*, 162 P.3d at 872. Courts thus often look for guidance to UFTA cases decided in other states, and they may also rely on bankruptcy cases when analyzing UFTA claims. *Lacey Marketplace Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd.*, 107 F. Supp. 3d 1155, 1159 (W.D. Wash. 2015) (citing *Thompson v. Hanson*, 174 P.3d 120, 126 (Wash. 2007)) ("Because an 'explicit purpose' of the Uniform Fraudulent Transfer Act is uniformity among adopting jurisdictions, Washington courts are guided by the interpretations of courts in other jurisdictions applying the Uniform Fraudulent Transfer Act and, when applicable, the underlying Bankruptcy Code.").

improper purpose behind the transfer." ECF No. 68 at 10. It continues that "despite knowing that GWG had a claim against A. Investments for $2.78 million, Gunn never informed GWG about the [f]raudulent [t]ransfer or the fact that the [f]raudulent [t]ransfer rendered A. Investments insolvent." *Id.* In response, Gunn cites no evidence indicating that she told GW Grundbesitz of the transfers before making them. So because the transfers were concealed, these factors weigh in favor of a finding of actual fraudulent intent.

Perhaps the closest factor here is the fourth, which is whether A. Investments had been sued or threatened with suit before the transfer was made. Nev. Rev. Stat. § 112.180(2)(d). GW Grundbesitz points to email communications exchanged on July 4, 2016, and asserts that those put Gunn and A. Investments on notice of impending litigation. ECF No. 68 at 9 (citing ECF No. 68-3). The litigation did not actually commence until November 2016. ECF No. 1 at ¶ 14. So the question is not whether A. Investments was actually sued before the transfer was made, but whether it had been threatened with a lawsuit, which may have prompted Gunn to initiate the transfers.

The July 4, 2016, email chain began with Wild emailing Gunn—copying legal counsel, Georg Maier-Reimer, for Wild's company, HP Wild Holding AG, and for GW Grundbesitz—demanding that A. Investments either refund the $2.78 million that it received for the German real estate or "approve the notarial deeds required to convey" them. ECF No. 68 at 9 (citing ECF No. 68-3 at 4–5). The email's subject line read "[o]pen issues that need immediate resolution." ECF No. 68-3 at 4–5. In the body of the email, Wild stated that the purchase price on the Dossenheim properties had been paid, "but ownership cannot be transferred, because the authori[z]ation of A. Investments LLC is missing nevertheless of numerous reminders. So the [m]oney has been pockete[d], but the ownership was not transferred. So either the [m]oney is pa[id] back o[]r the authorization is received here within 5 working days." *Id.* Seemingly referring to another issue, Wild wrote that some of his employees had used his credit cards and that Gunn had needed to pay those bills since January 1, 2016. *Id.* at 5. He declared "[t]his now

16

goes on for 6 month[s] and has to end." *Id.* And he continued that company credit cards can be used for authorized purchases only, and employees violating that "will receive warning letters." *Id.*

The emails show that Gunn responded to Wild's email the same day, also copying Maier-Reimer. *Id.* at 2–4 (despite the email not showing that Maier-Reimer was copied, Gunn notes that she copied him). Gunn's response is quite antagonistic, beginning by stating that "[j]ust because I caught you spending the weekend with your girlfriend[,] there is no need to take it out on me, as a form of diversion." *Id.* at 2. She accuses Wild of "pick[ing] a fight using false assertions" to end their romantic relationship so that he could be with a different woman. *Id.* at 4. She refers to the legality of her own actions ("I do not owe, nor am I legally responsible for[,] any expenses incurred by your employees") and acknowledges that Wild was making "demands" that she refused to meet. *Id.* at 4. Gunn also addressed specific provisions of agreements between her and Wild, articulating her understanding of what they had agreed to regarding the Dossenheim properties and as to the various expenses Wild was obligated to cover. *Id.* at 3–4. The third and apparently final email in the exchange is Wild's response to Gunn, again copying Maier-Reimer. *Id.* at 1. Wild apologizes to Maier-Reimer for having "to read that BS" and explains that he is "sick and tired to be constantly terrorized and harra[ss]ed." *Id.* He concludes with a directive to "[j]ust get the issues addressed done." *Id.*

Gunn characterizes the July 4 emails as "at best ambiguous." ECF No. 71 at 4. She objects to GW Grundbesitz's assertion that the emails "informed Gunn of 'the consequences if the demand was ignored,' implying the 'consequence' was litigation, but the emails do not make that clear." *Id.* at 4 (quoting ECF No. 68 at 10). She argues that the emails' ambiguity creates a question of fact that must be resolved by a jury—when it first became reasonable for A. Investments to anticipate litigation. *Id.* Further, Gunn indicates that "AI did not anticipate litigation until October 2016, four months after the [t]ransfer." ECF No. 71 at 3; ECF No. 71-2 (demand letter to A. Investments). She says that it was not until October 6, 2016, that Maier-

Reimer sent Gunn a demand letter and that the "consequences" referred to in the July 4 emails did not clearly threaten litigation. *Id.* at 4.

There is no question that the emails are ambiguous. Nowhere in them does Wild plainly threaten to sue Gunn or A. Investments. *See* ECF No. 68-3. However, portions of the emails—including Gunn's response—and the context surrounding them support the proposition that Gunn and A. Investments should have reasonably anticipated litigation at some point. Gunn's response clearly shows that the situation had escalated and that the relationship between her and Wild had deteriorated beyond what it had been before. She repeatedly referenced provisions of the written agreement between her and Wild, defended her conduct as legal, and acknowledged that Wild was making demands. The emails also demonstrate that she and Wild had an ongoing close relationship for quite some time. And she pointedly remarks that Wild copied multiple individuals on his initial email to her, including Maier-Reimer. ECF No. 68-3 at 3. Gunn indicates that she intentionally kept legal counsel copied on the email chain. Due to the nature of their relationship, there is no dispute of material fact about whether Gunn would have known that Maier-Reimer was legal counsel for Wild's company and for GW Grundbesitz.

Further, as Wild noted in his initial email, these issues had been going on for more than six months, since December 2015 when GW Grundbesitz paid the purchase price of the Dossenheim properties to A. Investments. ECF No. 64-6 at ¶ 7; ECF No. 68-3. Gunn may have opposed Wild's position that she needed to either refund the money or provide the deeds to the properties, but that does not change the fact that she was on notice that Wild was demanding one of those two scenarios to occur. With a sum like $2.78 million at play, any reasonable person would have understood that Wild's email—including Wild's legal counsel—was threatening litigation. The ambiguity of the emails may create an issue of fact, but it is not a *material* issue of fact appropriate for determination by a jury.[9]

---

[9] This is but one of many factors that I may consider in assessing whether Gunn had the requisite fraudulent intent when she made the transfer, and no single factor is dispositive. *See In re Tarkanian*, 562 B.R. at 458 (wherein the court "emphasized that the existence of any or all of the badges of fraud is not

The fifth badge of fraud is whether the transfer was of substantially all of A. Investments' assets. Nev. Rev. Stat. § 112.180(2)(e). And the ninth factor is whether A. Investments was insolvent or became insolvent shortly after the transfer was made. Nev. Rev. Stat. § 112.180(2)(i). I consider these factors together. They are quite straightforward, as the bank statements produced in discovery show that all of A. Investments' funds were transferred out of its accounts on July 27, 2016, leaving a $0 balance. ECF Nos. 68-4 at 6, 68-5 at 3. Gunn also confirmed in a deposition that the balance of A. Investments' account when she ceased being its manager was "[z]ero," and she represented that she closed the account in July 2016. ECF No. 71-4 at 5. Gunn also testified that she does not remember how A. Investments paid its filing fee with the State of Nevada in 2019 when it dissolved, given that A. Investments' checking account balance in 2016 was $0 and the account was closed by the time A. Investments dissolved. *Id.* at 11–12. Based on the evidence before me, it appears that A. Investments would likely have been insolvent if any debts were to arise, due to its lack of assets at its disposal. Because the evidence shows that A. Investments was likely insolvent after the transfer was made and that the transfer constituted all of its assets, both of these factors support an inference of actual intent.

The sixth badge of fraud is whether the debtor absconded. Nev. Rev. Stat. § 112.180(2)(f). GW Grundbesitz does not directly address this factor in its summary-judgment motion, nor does Gunn in her response. Black's Law Dictionary defines "abscond" as "[t]o depart secretly or suddenly, esp. to avoid arrest, prosecution, or service of process" and alternatively as "[t]o leave a place, usu. hurriedly, with another's money or property." *Abscond*, Black's Law Dictionary (11th ed. 2019). But some courts have interpreted this factor somewhat loosely, not necessarily requiring that the debtor actually depart. *See, e.g.*, *In re Houston Drywall, Inc.*, 2008 WL 2754526 (Bankr. S.D. Tex. 2008) (analyzing the badges of fraud and finding that the debtor absconded by refusing to answer the door when a process server attempted service); *In re Neal*, 2008 WL

dispositive of the issue of impermissible intent nor does it even create a presumption of such intent"). While I find that this factor is a closer call than the others, I decline to find that it weighs in Gunn's favor and instead find that it was reasonable for Gunn to anticipate imminent litigation in July 2016.

11445440, at *7 (finding that "the debtors absconded by repeatedly refusing to answer their door despite being in residence"). Here, neither A. Investments nor Gunn necessarily departed or fled. Gunn appears to have actively participated in defending the various lawsuits over the last several years, and nothing in the record shows that she absconded. The only possible evidence of absconding is that A. Investments filed articles of dissolution in February 2019, dissolving the company with the State of Nevada. ECF No. 68 at 4; ECF No. 71 at 3; Gunn's Dep. Tr., ECF No. 71-4 at 12. But the dissolution occurred nearly three years after the transfers were made, which was also long after A. Investments had been sued for unjust enrichment in Germany. Because there is no evidence of abscension, this badge of fraud is not an indicia of actual intent.

The eighth badge of fraud is whether the value of consideration received by A. Investments was reasonably equivalent to the value of the funds transferred. Nev. Rev. Stat. § 112.180(2)(h). GW Grundbesitz argues that "Gunn admits that she provided no consideration (let alone a 'reasonably equivalent value') in exchange for the [f]raudulent [t]ransfer." ECF No. 68 at 2. Indeed, in the first set of interrogatories in the recognition action, GW Grundbesitz asked Gunn to identify all transfers made by A. Investments from December 1, 2015, onward, including "[a]ny [c]ompensation received by A. Investments for the [a]sset." ECF No. 68-1 at 3. Her response states that "[o]n July 27, 2016, $2,856,824.79 was transferred out of the Bank of America account which left a balance of zero. The transferee was Lezlie Gunn." *Id.*

Under Federal Rule of Civil Procedure 33, a party responding to interrogatories must answer each interrogatory "separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). And it is well established that the failure to timely object to interrogatories constitutes a waiver of any objection. *Davis v. Fendler*, 650 F.2d 1154, 1160 (9th Cir. 1981). Gunn did not object to this interrogatory, nor did she fully answer it. I construe her omission of any reference to consideration or compensation exchanged for her receipt of the funds transfer as a denial that any consideration was given. Gunn presents no evidence that she ever provided consideration. This badge of fraud is thus indicative of actual intent.

The tenth badge of fraud is whether the transfer occurred shortly before or shortly after a substantial debt was incurred. Nev. Rev. Stat. § 112.180(2)(j). GW Grundbesitz contends that "the timing of the [f]raudulent [t]ransfer forecloses any doubt that Gunn acted with the requisite intent to 'hinder, delay[,] or defraud' GWG." ECF No. 68 at 9. It again refers to the email exchange between Wild and Gunn in early July 2016, noting that Gunn was on notice of impending litigation and that A. Investments had incurred a substantial debt related to the Dossenheim properties. *Id.* It is undisputed that Wild's company wired funds to A. Investments for the Dossenheim properties in December 2015. ECF No. 68 at 2; ECF No. 71 at 3. Six months later, Wild emailed Gunn demanding either a refund of the payment or the execution of the notarial deeds for the properties. ECF No. 68-3. And just weeks after, Gunn transferred all of A. Investments' funds from its business accounts to her personal account. Regardless of precisely when A. Investments incurred its debt—either in December 2015 or later in 2016 when it refused to refund Wild or give him the properties—the accounts were emptied shortly after. This factor thus tips in favor of a finding of actual intent. As discussed supra and as GW Grundbesitz admits, the eleventh badge of fraud—whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor—is inapplicable here.

The Ninth Circuit recognizes that "[t]he presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)). Further, "[t]here is no minimum number of factors that are required to demonstrate fraudulent intent, and only one or two badges of fraud may suffice to find a transfer was made with actual fraudulent intent." *In re Fox Ortega Enters., Inc.*, 631 B.R. 425, 445 (Bankr. N.D. Cal. 2021) (citing *Ezra v. Seror (In re Ezra)*, 537 B.R. 924, 931 (B.A.P. 9th Cir. 2015); *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834 (Cal. Ct. App. 2005)).

Here, nine of the eleven badges of fraud are established—all but the debtor absconding and the inapplicable factor of a debtor transferring assets to a lienor. So of the ten applicable badges of fraud, nine exist here. I acknowledge that no mathematical formula can weigh the factors and determine the presumption of fraudulent intent. But having reviewed all of the evidence in the record, I find that the nine badges of fraud and the case-specific facts and context leading up to the July 2016 transfers support a finding of actual intent to defraud.

3.      Gunn fails to meet her shifted burden.

     i.      *Gunn is not entitled to a good-faith defense.*

GW Grundbesitz has met its initial burden of showing that the transfer had many indicia of fraud. *Real Prop. Located at 5208 Los Franciscos Way, L.A., Cal.*, 385 F.3d at 1192. The burden now shifts to Gunn to demonstrate that she had a legitimate reason for making the transfers. *Id.* Gunn's primary argument is that she made the transfer "to offset Wild's debt to her under the [Release and Settlement Agreement] (RSA) and because paragraph 5 of the RSA entitles her to receive the money." *Id.* at 8–14 (cleaned up). She makes this argument in both her response to GW Grundbesitz's motion and in her own motion for summary judgment. *Id.*; ECF No. 63 at 1–2, 7, 10, 17–18. She uses this theory to combat a finding of intent to defraud, arguing that she made the transfer for valid reasons—that she was owed a debt by nonparty Wild.

As discussed supra, Gunn does not dispute that she made the transfers. But she insists that she did so in good faith reliance on the contractual language in the RSA between her and Wild. Under Nevada law, "[a] transfer . . . is not voidable . . . against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." Nev. Rev. Stat. § 112.220(1). The essence of Gunn's good-faith defense is that she and Wild entered into the RSA "while ending their relationship" and that under the agreement, Wild was to pay her the purchase price of the Dossenheim properties, along with multi-million-dollar gifts annually for ten years. ECF No. 63 at 2. She admits that she "made the [t]ransfer because the RSA expressly entitles her to receive the [p]urchase [p]rice, as well as to offset Wild's debt to

her under the RSA." *Id.* GW Grundbesitz counters that "Gunn's setoff contention has been rejected by courts in Germany (by the Regional Court of Heidelberg and the Karlsruhe Higher Regional Court) and the United States (by the United States District Court for the District of Nevada and the Ninth Circuit Court of Appeals)." ECF No. 67 at 3.

Indeed, the record reflects this. In the recognition action, Judge Dorsey pointedly addressed this argument, acknowledging that "[s]etoff is a doctrine used to extinguish the mutual indebtedness of parties who each owe a debt to one another." *GW Grundbesitz,* 2021 WL 3878293, at *9 (quoting *Aviation Ventures, Inc. v. Joan Morris, Inc.,* 110 P.3d 59, 63 (Nev. 2005)). She continued that "for setoff to make any sense here, the defendants would have to show that they have an enforceable debt against *GW Grundbesitz*—not Wild, because he isn't a named party in this action." *Id.* Concluding that A. Investments failed to meet its burden of demonstrating mutual indebtedness between itself and Wild—and thus failing to show that GW Grundbesitz was responsible for Wild's debts under the RSA—Judge Dorsey rejected the setoff argument. The Ninth Circuit affirmed Judge Dorsey's decision, finding that "[t]he settlement agreement references the obligations of Wild's 'estate,' but that does not raise a question of fact as to whether Grundbesitz owes a debt to A. Investments. 'Estate' in the agreement refers to the property Wild will leave behind when he dies; because he is still alive, he has no estate, and Grundbesitz cannot be a part of it." *GW Grundbesitz,* 2022 WL 3645062, at *2. The German courts similarly considered and rejected this setoff argument. ECF No. 64-9 at 8. The Heidelberg Regional Court stated that "the payment [for the Dossenheim properties] was not made from a private account of Dr. Wild to a private account of Ms. Gunn, so it is unclear how this can be a payment for the satisfaction of any obligations under the" RSA. *Id.*

The Nevada Supreme Court has described the good-faith defense in the UFTA context:

> Given the Legislature's intent that this court interpret the UFTA in Nevada to conform to other states' interpretations of their respective versions of the UFTA, we conclude that, in order to establish a good faith defense to a fraudulent transfer claim, the transferee must show objectively that he or she did not know or had no reason to know of the transferor's fraudulent purpose to delay, hinder, or defraud the transferor's creditors.

1  *Herup*, 162 P.3d at 876. As Gunn herself notes, "[t]he plaintiff-creditor is entitled to summary

2  judgment when 'no jury could reasonably find any legitimate explanation for' the transfer." ECF

3  No. 71 at 8 (quoting *Cadle Co. v. Newhouse*, 2002 WL 1888716, at *7 (S.D.N.Y. Aug. 16, 2002), *aff'd*,

4  74 F. App'x 152 (2d. Cir. 2003)). But four courts—two in Germany and two in the United States,

5  including a court whose opinion binds my own—have summarily rejected Gunn's unrelenting

6  claim that she was entitled to the funds under the RSA with Wild. Gunn presents no novel

7  argument on this point, nor does she present any valid reason for me to go against the weight of

8  these other courts' decisions on this precise issue. I thus decline to consider her argument and

9  adopt the conclusion of the other courts that the setoff doctrine does not apply. Gunn has not

10 shown that *she* was entitled to a payment *GW Grundbesitz* because of her agreement *with Wild*. So

11 she fails to present a legitimate reason for making the transfers and falls short of meeting her

12 shifted burden.

13                            ii.        *Gunn's statute-of-limitations defense fails.*

14        Gunn asserts that this lawsuit is time barred based on GW Grundbesitz's knowledge of

15 the dissolution of A. Investments. ECF No. 63 at 10–17. But Gunn wholly misconstrues Nevada

16 law. The relevant inquiry is not when GW Grundbesitz knew or should have known of A.

17 Investments' *dissolution*, but rather when it knew or should have known of the *fraudulent transfers*.

18 *See* NRS § 112.230(1). The evidence shows that GW Grundbesitz did not learn about either

19 fraudulent transfer until November 1, 2021, when it received Gunn's responses to post-judgment

20 discovery in the recognition action. It brought its complaint in this case 18 days later. I thus find

21 that this case was timely brought, so Gunn's statute-of-limitations defense fails.

22        It is undisputed that Nevada law governs the statute of limitations in this case. ECF No.

23 63 at n.5; ECF No. 67 at 6–9. And under Nevada law, "[a] claim for relief with respect to a

24 fraudulent transfer or obligation under this chapter is extinguished unless action is brought . . .

25 within 4 years after the transfer was made or the obligation was incurred or, if later, within 1

26 year after the transfer or obligation was or could reasonably have been discovered by the

claimant[.]" Nev. Rev. Stat. § 112.230(1)(a). The two transfers at issue in this case occurred on the same day: July 27, 2016. ECF No. 68-4 at 6; ECF No. 68-5 at 3. Four years after that date was July 27, 2020. This lawsuit was filed on November 19, 2021, which is clearly after the four-year limitations period. So the second part of the statute applies, and GW Grundbesitz must have brought suit within one year of learning about the transfers.[10] NRS § 112.230(1)(a).

GW Grundbesitz asserts that it did not learn of Gunn's fraudulent transfer until November 1, 2021, and that its filing of the complaint merely 18 days later was thus timely. ECF No. 67 at 6. Gunn makes several alternative arguments as to why the lawsuit was untimely filed. ECF No. 63 at 10–17. First, Gunn argues that GW Grundbesitz knew *and* should have known in March 2020 that Gunn would transfer the company's assets to herself because its Rule 30(b)(6) witness testified in March 2020 that GW Grundbesitz knew of A. Investments' impending dissolution. ECF No. 63 at 11–14. Under this theory, GW Grundbesitz therefore had until March 2021 to file suit—rendering its November 2021 complaint in this case untimely. *Id.* And second, Gunn argues that GW Grundbesitz had a duty to monitor A. Investments' public filings and thus should have known on the date its articles of dissolution were filed—February 20, 2019— that Gunn had fraudulently transferred all of A. Investments' funds to herself. *Id.* at 14–16.

### A.     GW Grundbesitz's timeliness argument

GW Grundbesitz contends that its claim was timely because it "initiated this action within one year of first learning of the [f]raudulent [t]ransfer." ECF No. 67 at 6. More specifically, it asserts that it filed its complaint in this lawsuit less than three weeks after first

---

[10] Alternatively, Gunn argues that the two-year statute of limitations in NRS § 86.505 applies. ECF No. 63 at 14–17. That statute governs the continuation of companies after dissolution for the winding up of affairs and sets forth the limitations period for actions by or against dissolved companies or their managers or members. Nev. Rev. Stat. § 86.505. This statute provides that dissolution of a company does not mean that lawsuits must cease to be brought against it. It essentially gives a two-year grace period after dissolution for lawsuits to be brought by or against the company. As GW Grundbesitz points out, it brings this lawsuit against Gunn individually, not as trustee of A. Investments and not against A. Investments itself. Because "Gunn is not a limited liability company," this statute does not apply to lawsuits brought against her individually. I reject Gunn's argument as to the applicability of NRS § 86.505 and decline to address it beyond this footnote.

learning of the fraudulent transfer. *Id.* It notes that in an effort to collect the judgment from the recognition action, it propounded post-judgment written discovery on Gunn, as trustee of then-dissolved A. Investments, in the fall of 2021. *Id.* Part of the discovery request asked Gunn to identify all of A. Investments' assets and any transfers of its assets between December 2015 and 2021. *Id.* She did so, serving her discovery responses on GW Grundbesitz on November 1, 2021. *Id.* In them, she disclosed the following: "On July 27, 2016, $2,856,824.79 was transferred out of the Bank of America account which left a balance of zero. The transferee was Lezlie Gunn." ECF No. 67-1 at 3. As such, GW Grundbesitz asserts that it first learned of the fraudulent transfer on November 1, 2021, the date that Gunn served her discovery responses in the recognition action. ECF No. 67 at 6. GW Grundbesitz then filed this fraudulent-transfer lawsuit on November 19, 2021. ECF No. 1; ECF No. 67 at 6. GW Grundbesitz remarks that Gunn does not dispute that it first obtained actual knowledge of the fraudulent transfer on November 1, 2021. ECF No. 67 at 6 (citing ECF No. 63 at 10–17). It notes that Gunn instead focuses on the alternative argument that GW Grundbesitz knew of A. Investments' dissolution by March 23, 2020, when it filed the recognition action. *Id.* This is because of testimony later given by GW Grundbesitz's Rule 30(b)(6) witness.

                                     **B.**       Rule 30(b)(6) witness testimony in March 2020

        The crux of Gunn's first timeliness argument is her contention that GW Grundbesitz's Rule 30(b)(6) representative, Jürgen Schnabel, testified during a deposition in October 2022 that "GWG believed Gunn would personally receive the [p]urchase [p]rice through the [d]issolution." ECF No. 63 at 3. Under this theory, "GWG had actual knowledge in March 2020 of the [d]issolution," so this fraudulent-transfer lawsuit must have been filed by March 2021— rather than November 2021. *Id.* at 3–4. When asked whether GW Grundbesitz believed that Gunn would personally receive $2.78 million in connection with the dissolution, Schnabel responded "yes." ECF No. 64-2 at 54. He further confirmed that at the time it filed the recognition action in March 2020, GW Grundbesitz was aware that A. Investments had

dissolved. *Id.* at 53–54. Gunn contends that "because an LLC's assets must be transferred upon dissolution (the assets do not just disappear), GWG knew or should have known in March 2020 that AI's assets had been transferred to someone other than itself." ECF No. 63 at 13–14.

No party disputes that Schnabel's testimony includes these responses. He conceded at his deposition that GW Grundbesitz knew of A. Investments' dissolution in March 2020 when it filed the recognition action. But knowledge of the dissolution is separate and apart from knowledge of an actual fraudulent transfer. The question to Schnabel was not whether GW Grundbesitz *actually knew* that Gunn had transferred the funds to herself with the actual intent of avoiding judgment. It was whether GW Grundbesitz *believed* that Gunn would personally receive the money. To sufficiently state a claim for an actual fraudulent transfer under NRS § 112.180(1)(a), a claimant must plead facts showing that the creditor had "actual intent to hinder, delay[,] or defraud any creditor." Nev. Rev. Stat. § 112.180(1)(a). This is the statute under which GW Grundbesitz brings its sole claim in this lawsuit. Although Schnabel's deposition testimony clearly shows that GW Grundbesitz knew of A. Investments' dissolution in March 2020 and that it believed Gunn would receive the dissolved company's funds, no evidence shows that GW Grundbesitz *actually knew* in March 2020 that the fraudulent transfer had occurred. It thus could not have brought a successful fraudulent-transfer claim, as it lacked knowledge of the transfer actually occurring. This argument therefore fails.

### C.   Articles of dissolution in February 2019

Gunn asserts that after obtaining the German judgment, GW Grundbesitz was required "to be diligent concerning the existence of possible claims arising from the German [j]udgment," which included an obligation "to monitor AI's public filings," meaning that GW Grundbesitz should have known in February 2019 when Gunn filed A. Investments' articles of dissolution that it had been dissolved. *Id.* at 4. This argument that GW Grundbesitz should have anticipated that Gunn would transfer all of A. Investments' assets to herself upon dissolution is unavailing. GW Grundbesitz goes as far as characterizing it as "absurd." ECF No. 67 at 7.

Gunn relies on NRS § 86.521 for this proposition, asserting that because she was A. Investments' only member, it was assumed under Nevada's statutory scheme that she would automatically receive all of the company's assets. ECF No. 63 at 11–12. Nothing in the law supports this notion. It is well established in Nevada that creditors must be paid what they are owed upon a company's dissolution. Nev. Rev. Stat. § 86.491(3)(a) (requiring that the person winding up a dissolved company's affairs "[s]hall distribute the assets of the company as provided in NRS 86.521 to the creditors of the company and the members of the company"); Nev. Rev. Stat. § 86.521 (detailing the order in which assets are to be paid upon a company's dissolution, beginning with liabilities to creditors "including members who are creditors"); *Lynch v. Awada*, 427 P.3d 123 (table), at *4 (Nev. 2018) ("As part of the winding up phase, a trustee has certain powers and obligations, which include 'collect[ing] and discharg[ing] the company's obligations' and 'distribut[ing] its money and other property among the members, *after paying or adequately providing for the payment of its liabilities and obligations*[.]'" (emphasis added) (quoting Nev. Rev. Stat. § 86.541(2)); *Canarelli v. Dist. Ct.*, 265 P.3d 673, 678 (Nev. 2011) ("[W]inding up is complete upon the final disposition of assets to the shareholders and the payment of debt to creditors."). As GW Grundbesitz puts it, "[d]espite what Gunn may hope, the dissolution of A. Investments did not give Gunn free rein to transfer all of A. Investments' assets to herself while ignoring A. Investments' creditors (like GWG)." ECF No. 67 at 8. Gunn even concedes this in stating that "[u]pon dissolution, an LLC's assets go to creditors and then to members." ECF No. 63 at 12 (citing Nev. Rev. Stat. § 86.521).

Gunn points to no authority—and I can find none—in Nevada or elsewhere holding that dissolution automatically puts a claimant on notice that a fraudulent transfer has occurred or will occur. When GW Grundbesitz learned of A. Investments' dissolution, its only knowledge was that the LLC was dissolving, not that there had been a fraudulent transfer—or indeed any transfer, whether fraudulent or not. Even assuming that GW Grundbesitz learned of the dissolution as early as possible by monitoring A. Investments' public filings, that would not

change the undisputed fact that GW Grundbesitz did not learn until November 1, 2021, that Gunn had actually transferred the funds from A. Investments' account to her personal account. Knowledge of the dissolution does not equate to knowledge—actual or constructive—of actual fraud.

D.    Conclusion

GW Grundbesitz met its initial burden, establishing that Gunn had the requisite statutory intent to defraud under Nevada law when she made the 2016 transfers to her personal accounts. Gunn fails to meet the shifted burden, nor does she present a triable issue of material fact that would preclude summary judgment. Based on the evidence before me, I grant summary judgment in GW Grundbesitz's favor, bringing this years-long international legal battle to a close.

**III.    Conclusion**

IT IS THEREFORE ORDERED that Gunn's motion to dismiss **[ECF No. 7] is DENIED** as moot.

IT IS FURTHER ORDERED that Gunn's appeal of the magistrate judge's order **[ECF No. 41] is DENIED**, and the magistrate judge's order **[ECF No. 40] is AFFIRMED** in its entirety.

IT IS FURTHER ORDERED that GW Grundbesitz's motion for judicial notice **[ECF No. 69] is GRANTED**.

IT IS FURTHER ORDERED that Gunn's motion for summary judgment **[ECF No. 63] is DENIED** and GW Grundbesitz's motion for summary judgment **[ECF No. 68] is GRANTED**. The Clerk of Court is directed to enter judgment accordingly and CLOSE THIS CASE.

DATED: July 14, 2023

_____
Cristina D. Silva
United States District Judge